01

02

03

04

05

06

07

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

08 GERALD ALAN SHERMAN,                )
                                       )   CASE NO.      C10-1209-JCC
09        Petitioner,                  )                 (CR05-181-JCC)
                                       )
10    v.                               )
                                       )   REPORT AND RECOMMENDATION
11 UNITED STATES OF AMERICA            )
                                       )
12        Respondent.                  )
   _____)

13

14                            <u>INTRODUCTION</u>

15        Petitioner Gerald Alan Sherman, proceeding pro se, filed a motion to vacate, set aside,

16 or correct his sentence pursuant to 28 U.S.C. § 2255.  (Dkt. 1.)   Petitioner asserts ineffective

17 assistance of counsel in violation of the Sixth Amendment, governmental and prosecutorial

18 misconduct, and an argument regarding his "honest services."   Respondent opposes

19 petitioner's motion to vacate.  (Dkt. 6.)  The Court, having reviewed petitioner's § 2255

20 petition, all papers and exhibits in support and in opposition to that petition, and the balance of

21 the record, concludes that petitioner's § 2255 petition should be denied without an evidentiary

22 hearing.

REPORT AND RECOMMENDATION
PAGE -1

01                                    BACKGROUND

02          On May 4, 2005, a federal grand jury returned an indictment charging petitioner with

03   nine counts of wire fraud, two counts of mail fraud, four counts of securities fraud, and a single

04   count of attempted bank fraud.   *United States v. Sherman*, CR05-0181-JCC (Dkt. 1).   On

05   October 25, 2006, the grand jury returned a Superseding Indictment including the same counts

06   along with six additional counts of wire fraud.   *Id.*   (Dkt. 72).

07          The government dismissed the attempted bank fraud count, id. (Dkt. 96), and petitioner

08   proceeded to trial on the remaining counts in November 2006.   The government contended at

09   trial that petitioner engaged in an extended scheme to defraud investors of more than $1.3

10   million by promising extraordinary profits within a short time period.   The government further

11   contended that petitioner, in fact, used the invested money to, among other things, fund a youth

12   hockey program he established, the Washington Evergreens All-Star Youth Hockey

13   ("Washington Evergreens").   The Washington Evergreens provided opportunities to play in

14   off season tournaments, free of charge to the families of the players, with paid coaches, and

15   travel throughout North America. (Dkt. 6, Add. B (Tr. 11/27/06 at 65-69).)

16          Evidence presented at trial established that petitioner held himself out as a general

17   manager of a business trust, JLA Nordstjaerna ("JLAN"), and as involved in extremely

18   lucrative and exclusive foreign securities investments.   (See, e.g., id. (Tr. 11/27/06 at 8, 39-40

19   and Tr. 12/04/06 at 43-47).)   Petitioner also represented in some instances that his trading

20   associates required a certain portion of the fees or profits from his trading go to a charity or

21   non-profit project.   (See, e.g., id. (Tr. 12/04/06 at 47-48).)   As reflected below, the

22   government presented a number of witnesses to support its case.

01          Elliott Severson testified that he obtained a $300,000 line of credit for the Washington

02   Evergreens to use for travel and other expenses following petitioner's representations that he

03   would shortly receive the funds to repay this bridge loan, and that he required the Washington

04   Evergreens as a non-profit component to his investments.  (*Id.* at 76-83.)  Petitioner never

05   repaid the loan, leading the bank to sue Severson.  (*Id.* at 83-84.)

06          Robert Duncan testified that petitioner twice discussed with him $10 million investment

07   opportunities associated with the Federal Reserve.  (*Id.* (Tr. 11/29/06 at 114-135).)  Duncan

08   testified that petitioner indicated an investment would result in a 100 percent return, with no

09   risk of loss.  (*Id.* at 116-17, 134-35.)  Utilizing a foreign company he set up as an investment

10   vehicle, DAR SA ("DAR"), Duncan and various friends and family members invested a total of

11   $397,000 with JLAN in May and June 2000.  (*Id.* at 136-38, 144-45.)  (*See also id.*, Add. B

12   (Tr. 11/30/06 at 28-32); Add. C (Exhs. 112, 113, and 114).)  A joint venture agreement and

13   promissory note prepared by petitioner promised, *inter alia*, a return of $397,000 each month

14   for eleven consecutive months.  (*Id.*, Add. B (Tr. 11/29/06 at 138-39); Add. C (Exhs. 107, 108,

15   and 116).)  Duncan testified that petitioner never told him the investment would be used to

16   fund the Washington Evergreens.  (*Id.*, Add. B (Tr. 11/29/06 at 145, 158-59); Add. C (Exh.

17   10).)  Petitioner transferred the funds to, among other things, the Washington Evergreens, and

18   the DAR investors did not receive returns on their investments.  (*Id.*, Add. B (Tr. 11/29/06 at

19   166-69 and Tr. 11/30/06 at 71-79, 84-95); Add. C (Exhs. 10 and 193).)

20          Milford Walker and Douwe Van Ess testified that petitioner presented them with an

21   investment opportunity involving the purchase and sale of Indonesian gold.  (*Id.*, Add. B (Tr.

22   11/27/06 at 110-15 and Tr. 11/29/06 at 57-58).)  Walker and Van Ess testified that petitioner

REPORT AND RECOMMENDATION
PAGE -3

01   indicated the investment would result in a substantial profit and virtually no risk.  (*Id.* (Tr.

02   11/27/06 at 110 and Tr. 11/29/06 at 58-59).)   Walker invested $100,000 through a line of credit

03   on his house, as well as $40,000 on behalf of a disabled cousin for whom he served as

04   conservator, while Van Ess invested $250,000 obtained through a loan secured by his dairy

05   farm.  (*Id.* (Tr. 11/27/06 at 102, 118 and Tr. 11/29/06 at 59-62).)   Joint venture agreements

06   and promissory notes from petitioner to Walker and his cousin promised a 400 percent return

07   monthly for ten consecutive months, and, for Walker, a one million dollar bonus after twelve

08   months.  (*Id.*, Add. C (Exhs. 301-304).)   As with the DAR investors, Walker and Van Ess

09   testified that petitioner never advised them the funds would be transferred to the Washington

10   Evergreens, and that they never received a return on their investments.  (*Id.*, Add. B (Tr.

11   11/27/06 at 122 and 11/29/06 at 10-14, 62-66).)   They further testified that petitioner never

12   advised them of any difficulty he was having in providing returns to other investors.  (*Id.* (Tr.

13   11/27/06 at 122 and Tr. 11/29/06 at 11, 60).)

14        Michael Martin testified that petitioner entered into an agreement with him to purchase

15   an ice hockey rink for approximately $2.6 million, payable at closing.  (*Id.* (Tr. 11/30/06 at

16   156-58).)   Petitioner did not pay Martin for the hockey rink, which the bank repossessed.  (*Id.*

17   at 159-60.)   Martin also gave petitioner $20,000 for a purported risk-free investment

18   opportunity involving the purchase and sale of foreign securities.  (*Id.* at 155, 160-62.)

19   Petitioner provided Martin with a joint venture agreement and promissory note reflecting that

20   the principal would be returned within ninety days, and that Martin would receive a $150,000

21   return each month for ten consecutive months.  (*Id.* at 162-67;  Add. C (Exhs. 401-402).)

22   Petitioner did not advise as to his failure to provide returns to earlier investors and did not

REPORT AND RECOMMENDATION
PAGE -4

01  provide any return on the investment (*id*., Add. B (Tr. 11/30/06 at 162-63, 170-73)), which was

02  used to support the Washington Evergreens and to provide for petitioner's personal expenses

03  (*id.*, Add. C (Exhs. 14 & 15)).

04        Testimony and documentary evidence also revealed that, in December 2003, petitioner

05  presented to Bank of America a $600 million letter of credit purportedly issued by Lloyds TSB

06  in favor of JLAN.  (*Id.*, Add. B (Tr. 12/04/06 at 27-35); Add. C (Exh. 600).)  Lloyds TSB

07  advised Bank of America that the document was fraudulent.  (*Id.*, Add. B (Tr. 12/04/06 at

08  35-36, 40-41).)

09        Robert Terhune testified that, in November 2003, he gave petitioner a $100,000

10  investment based on petitioner's promise of a risk-free $500,000 return within weeks.  (*Id.* at

11  48-50.)  Terhune described petitioner as explaining his qualification to participate in various

12  trading programs as stemming from his involvement in the Washington Evergreens as a

13  humanitarian project, and as indicating the $100,000 would be used to pay fees associated with

14  obtaining the above-described $600 million Lloyds TSB letter of credit.  (*Id.* at 43-49.)

15  Terhune had no intention of making a donation to the Washington Evergreens through his

16  investment, and was not advised as to any problems petitioner was having making payments or

17  returns to earlier investors.  (*Id.* at 50-55.)  Terhune also testified that petitioner failed to

18  inform him that Bank of America had refused to honor the letter of credit, and that he went on to

19  invest an additional $560,000 with petitioner based on representations that the funds were

20  necessary to keep the hockey program going in order to realize a profit on the investments.  (*Id.*

21  at 58-62, 92-93; Add. C (Exh. 501).)  Terhune received no return on his investments. (*Id.*, Add.

22  B (Tr. 12/04/06 at 83).)

REPORT AND RECOMMENDATION
PAGE -5

01          Petitioner contended at trial that he had a good faith belief in the investment

02    opportunities at issue and, therefore, no intent to defraud the investors.   *See Sherman*,

03    CR05-0181C (Dkts. 145-147).   His testimony directly contradicted the testimony of witnesses

04    regarding, among other things, his statements as to risks of loss with the investments and

05    whether he revealed the money invested would be used to fund a youth hockey program.   For

06    instance, petitioner testified that he informed both Duncan and Van Ess that money invested

07    would be used for the Washington Evergreens, and that he told both Walker and Van Ess that

08    the investments would be used, in part, to fund his personal expenses.   *See, e.g., id.* (Dkt. 146

09    at 37-39, 49-51).   He also testified that he fully advised Van Ess and Martin of the risks

10    associated with their investments.   *See, e.g., id.* at 45, 65-66.

11          The jury found petitioner guilty of fifteen counts of wire fraud, two counts of mail fraud,

12    and four counts of securities fraud.   *Id.* (Dkt. 119).   The Court sentenced petitioner to 84

13    months of imprisonment; a sentence which included an obstruction of justice component.   *Id.*

14    (Dkts. 130, 131 & 135).   Petitioner appealed and the Ninth Circuit Court of Appeals affirmed

15    the conviction, but reversed the sentence and remanded for resentencing based on the lack of

16    findings to support the obstruction adjustment.   *Id.* (Dkt. 152-2).   On remand, the Court again

17    imposed a sentence of 84 months imprisonment.   *Id.* (Dkt. 157).   The Court also made

18    detailed findings to support the obstruction adjustment, including examples of petitioner's false

19    testimony at trial regarding statements he made to solicit funds from the investor victims.   *Id.*

20    (Dkt. 165).   Petitioner again filed an appeal, which the Ninth Circuit denied.   *Id.* (Dkt. 167).

21                                              DISCUSSION

22          Petitioner alleges ineffective assistance of counsel and prosecutorial and judicial

REPORT AND RECOMMENDATION
PAGE -6

01  misconduct, as well as an argument regarding his "honest services."   As observed by

02  respondent, because petitioner failed to raise the misconduct or honest services claims on

03  appeal, they appear to be procedurally defaulted. *Massaro v. United States*, 538 U.S. 503, 504

04  (2003) ("[C]laims not raised on direct appeal [excluding ineffective assistance of counsel] may

05  not be raised on collateral review unless the petitioner shows cause and prejudice.")

06  Moreover, even if not defaulted, all of petitioner's claims lack merit for the reasons described

07  below.

08  A.      Ineffective Assistance of Counsel

09          The Sixth Amendment guarantees a criminal defendant the right to effective assistance

10  of counsel.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).   Courts evaluate claims of

11  ineffective assistance of counsel under the two-prong test set forth in Strickland.   Under that

12  test, a defendant must prove (1) that counsel's performance fell below an objective standard of

13  reasonableness and (2) that a reasonable probability exists that, but for counsel's error, the

14  result of the proceedings would have been different.   *Id.* at 687-694.

15          When considering the first prong of the Strickland test, judicial scrutiny must be highly

16  deferential.   *Id.* at 689.   There is a strong presumption that counsel's performance fell within

17  the wide range of reasonably effective assistance.   *Id.*   The Ninth Circuit has made clear that

18  "'[a] fair assessment of attorney performance requires that every effort be made to eliminate the

19  distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged

20  conduct, and to evaluate the conduct from counsel's perspective at the time.'"   *Campbell v.*

21  *Wood*, 18 F.3d 662, 673 (9th Cir. 1994) (quoting Strickland, 466 U.S. at 689).

22          The second prong of the Strickland test requires a showing of actual prejudice related to

REPORT AND RECOMMENDATION
PAGE -7

01 counsel's performance.   The reviewing court need not address both components of the inquiry

02 if an insufficient showing is made on one component.   *Strickland*, 466 U.S. at 697.

03 Furthermore, if both components are to be considered, there is no prescribed order in which to

04 address them.   *Id.*

05      Plaintiff argues the ineffectiveness of his counsel in failing to call or depose witnesses

06 on his behalf, including Albert Loucaides, Jay Workman, David Johnson, Patrick McCleary,

07 Ganesan Sinnayah, and Chris McDiarmid.   (Dkt. 1 at 11-13.)   Petitioner asserts that

08 Loucaides could have attested to his due diligence and the viability of the format for the

09 transactions he envisioned, that Workman, Johnson, and McCleary could have attested to his

10 meetings and interactions with various investors, and that Sinnayah and McDiarmid could have

11 verified his testimony regarding the Indonesian gold and the letter of credit respectively.   (*Id.*)

12      Petitioner also states that he was "astounded" when his counsel "admitted to the jury

13 that he didn't understand the nature of [his] business structure[,]" suggesting this "explain[ed]

14 why so many poignant cross-examination opportunities were left wanting" and "underscores

15 [his] contention that [his] side of the story was never fully and accurately told during the

16 [trial]."  (Id. at 13.)   Additionally, in his reply, petitioner points to his counsel's failure to

17 utilize, as support for his character, a 1994 letter from the government thanking him for his

18 assistance in obtaining convictions in a fraud case.   (Dkt. 13 at 4-5 and Dkt. 14.)   However, as

19 argued by respondent and discussed below, petitioner fails to establish the ineffectiveness of his

20 counsel.

21      Strategic trial decisions, such as whether to call a witness at trial, "rest[] upon the sound

22 professional judgment of the trial lawyer."   *Gustave v. United States*, 627 F.2d 901, 904 (9th

REPORT AND RECOMMENDATION
PAGE -8

01  Cir. 1980).  *See also* Strickland, 466 U.S. at 690 ("strategic choices made after thorough

02  investigation of law and facts relevant to plausible options are virtually unchallengeable.")   As

03  recognized by the Ninth Circuit, "[f]ew decisions a lawyer makes draw so heavily on

04  professional judgment as whether or not to proffer a witness at trial."   *Lord v. Wood*, 184 F.3d

05  1083, 1095 (9th Cir. 1999).    An attorney may decline to call particular witnesses for a variety

06  of tactical reasons.  *See, e.g.*, *Downs v. Hoyt*, 232 F.3d 1031, 1041 (9th Cir. 2000) (witness

07  would have provided little benefit at great risk, as well as duplicative testimony); *Wilson v.*

08  *Henry*, 185 F.3d 986, 989 (9th Cir. 1999) (testimony largely at variance with evidence);

09  *Denham v. Deeds*, 954 F.2d 1501, 1505-06 (9th Cir. 1992) (inconsistencies in witness

10  testimony).

11        In this case, trial counsel proceeded on the theory that petitioner had a good faith belief

12  in the investment opportunities for which he solicited funds.  *See, e.g., Sherman*, No. CR

13  05-181C (Dkt. 142 at 35 (stating in his opening statement: "But the evidence will also show you

14  that Mr. Sherman, far from having an intent to deceive or defraud people, honestly believed he

15  could pull these deals off."))   He pursued this defense through cross-examination of

16  government witnesses, securing, for example, a concession that the government's expert

17  witness could not speak to whether an individual could have a good faith belief in the

18  legitimacy of investment opportunities for which he or she was soliciting funds.  *Id.* (Dkt. 143

19  at 108-09).  *See also id.* (Dkt. 142 at 7 (petitioner's counsel's motion in limine, although

20  denied, succeeded in limiting the scope of the expert's testimony)).   Counsel also developed

21  testimony providing support for petitioner's belief in the legitimacy of the $600 million Lloyds

22  TSB letter of credit both before and after he was told there was a problem with the letter.  *Id.*

REPORT AND RECOMMENDATION
PAGE -9

01  (Dkt. 145 at 40-41 (testimony of Bank of America employee showed petitioner was made

02  aware the letter of credit would be investigated prior to any transaction with the bank, that he

03  continued to believe it was a real letter of credit after being told of a problem, and that he

04  followed up with Bank of America to describe his efforts to resolve the issue with Lloyds

05  TSB)).   Counsel further pursued petitioner's good faith defense through his extensive direct

06  examination of petitioner.   *See generally id*. (Dkts. 145-47).

07       The extent to which petitioner's counsel interviewed potential witnesses remains

08  unclear.   (*See* Dkt. 13 at 2 (petitioner asserts that his counsel "barely spoke—if at all—to [the

09  identified potential witnesses] and other parties on my behalf, despite my entreaties to do so."))

10  He was, however, clearly aware of the witnesses identified here by petitioner, three of whom –

11  Loucaides, Sinnayah, and McDiarmid – lived outside the United States, and two of whom –

12  Johnson and Workman – were listed as witnesses by the government.   In fact, petitioner's

13  counsel successfully obtained a continuance based on Loucaides' inability to travel to the

14  United States as a result of health problems.   *Sherman*, No. CR05-181C (Dkts. 50 & 56

15  (continuance granted March 2006)).   A subsequent letter from Loucaides reflected that he

16  remained unable to travel long distances.   (*See* Dkt. 13-1 at 1-2 (June 2006 letter from

17  Loucaides to counsel).)   The record also reflects the continued unavailability of McDiarmid on

18  the eve of trial.   *Sherman*, No. CR05-181C (Dkt. 142 at 5-7 (petitioner, in seeking a

19  continuance, conceded his inability to locate McDiarmid)).

20       In any event, even assuming their availability, petitioner fails to establish that the

21  decision to not depose or call these individuals fell below an objective standard of

22  reasonableness.   Instead, that decision can be attributed to strategic decision-making. Indeed,

01  in closing argument, petitioner's counsel used the government's failure to call either Workman

02  or Johnson to petitioner's benefit, suggesting it was these individuals, rather than petitioner,

03  who made misrepresentations to investors.  *See, e.g., id.* (Dkt. 147 at 74-75 ("Mr. Workman[, a

04  witness to the encounter,] wasn't even called as a witness by the Government."; "We don't

05  know what Mr. Workman expected, because of course he didn't testify.";  "So why is Mr.

06  Sherman on trial for something that Mr. Devoe or Mr. Workman likely told this guy?   The

07  answer is he shouldn't be.") and 76-78 (noting that David Johnson's name came up repeatedly

08  in testimony as an individual making representations to investors; stating:  "The government

09  didn't call him, so we don't know exactly what Mr. Johnson was telling people."; "So the

10  evidence is clear, Mr. Sherman had nothing to do with inducing those people to put money into

11  this.   That was all Duncan, Johnson and Wing."))   Petitioner's counsel, therefore, utilized the

12  absence of these witnesses to cast doubt on the government's case.   He also, in declining to call

13  these or other witnesses, avoided the possibility that any of these individuals could have

14  proffered testimony harmful to petitioner.

15          Petitioner also fails to establish prejudice in relation to this claim.   Although petitioner

16  insisted he had a good faith belief in the various transactions at issue, numerous witnesses

17  testified that petitioner made misrepresentations regarding both the risks of loss and the nature

18  of investment opportunities.   As stated by the Court during resentencing:  "The jury did not

19  believe Mr. Sherman's version of the facts, nor did the Court.   . . .   Mr. Sherman intentionally

20  lied on the stand regarding what he told his victims regarding the potential risk they faced in

21  giving him large sums of money or the reality of how he intended to use their money." *Id.* (Dkt.

22  165 at 12-13).   Considering the totality of the evidence presented, it cannot be said there was a

REPORT AND RECOMMENDATION
PAGE -11

01   reasonable probability that, but for the failure to call witnesses, the result of the proceedings

02   would have been different.

03         Nor does petitioner otherwise demonstrate ineffective assistance of counsel.   Contrary

04   to petitioner's contention, the record reveals that his counsel zealously cross-examined the

05   government witnesses.  In addition to that described above, the cross examination yielded

06   Robert Duncan's testimony of lies he told a bank regarding his knowledge of Sherman and

07   Sherman's business activities, his failure to disclose to all of the investors he solicited that he

08   would take a large share of any return, while he put only $1000 of his own money at risk, and

09   his failure to sufficiently verify whether the investment opportunity was a sound financial

10   transaction.  *Id.* (Dkt. 144 at 9-21).  Petitioner's counsel similarly portrayed Milford Walker

11   in an unfavorable light through his testimony concerning his investment of his disabled

12   cousin's money.  *Id.*  (Dkt.  143 at 37-38).

13         The record also belies petitioner's contention that his counsel was somehow

14   insufficiently informed about his case.  *See generally* (Dkt. 142 at 34-38 (opening statement)

15   and Dkts. 145-147 (direct examination of petitioner)).  Petitioner's counsel did state during

16   closing argument:  "I don't pretend to understand what the hell a medium term note is."  *Id.*

17   (Dkt. 147 at 82).  However, read in full, the argument reflects that petitioner's counsel was

18   merely emphasizing that the question in this case was not whether or not the investment

19   opportunities petitioner presented were valid, but whether or not petitioner had a good faith

20   belief in their validity.   Petitioner's counsel, accordingly, went on to state:

21            And you have got the Federal Reserve Bulletin.   Good luck with it.   I have read
             it, Mr. Sherman has read it, the government has read it.   But one thing I submit
22            is quite clear, that Mr. Sherman thinks he knows something about this market.

REPORT AND RECOMMENDATION
PAGE -12

01
02
03

> And he is told you what that is based on.  It is based on his travels and his experience and his discussions. . . .    The issue is did Jerry Sherman believe it and behave consistent with it.  I submit that is evidence of his honest belief, regardless of whether he is mistaken or delusional or stupid.   It is good faith.

04  *Id.* at 82-85.

05       Finally, there is no basis for concluding that trial counsel's failure to utilize the

06  above-described 1994 letter as support for petitioner's character constituted ineffective

07  assistance.   That is, even assuming the relevance of that letter, petitioner cannot show, in light

08  of the evidence as a whole, that its inclusion into evidence would have altered the outcome of

09  his trial.

10       In sum, petitioner fails to show that his counsel's performance fell below an objective

11  standard of reasonableness or resulted in actual prejudice.     Accordingly, petitioner's

12  ineffective assistance of counsel claim should be denied.

13  B.      Prosecutorial Misconduct

14       In analyzing a claim of prosecutorial misconduct, the appropriate standard of review is

15  the narrow one of due process and not the broad exercise of supervisory power. *See Darden v.*

16  *Wainwright*, 477 U.S. 168, 181 (1986).  *See also Smith v. Phillips*, 455 U.S. 209, 219 (1982)

17  ("the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the

18  fairness of the trial, not the culpability of the prosecutor").   "To warrant habeas relief,

19  prosecutorial misconduct must 'so infect the trial with unfairness as to make the resulting

20  conviction a denial of due process.'"   *Davis v. Woodford*, 384 F.3d 628, 644 (9th Cir. 2003)

21  (*quoting Darden*, 477 U.S. at 181).

22  / / /

REPORT AND RECOMMENDATION
PAGE -13

01       1.   <u>Misdemeanor citation</u>:

02       Petitioner first asserts prosecutorial misconduct through the improper "fixing" of a

03 reckless burning citation in order to secure the testimony of Douwe Van Ess.   As revealed in a

04 document produced during discovery, an FBI agent seeking information from Van Ess

05 discovered that his reluctance to speak to law enforcement stemmed from an incident in which

06 he believed he had inappropriately received a citation for reckless burning.   (Dkt. 6, Add. H.)

07 The agent's inquiries led to the dismissal of the citation, and Van Ess subsequently cooperated

08 in the investigation.  (*Id.*)

09       Petitioner maintains that the agent's actions contaminated Van Ess's testimony.

10 However, as argued by respondent, the benefit conferred upon Van Ess – the dismissal of a

11 citation – was both relatively minimal and disclosed to the defense prior to trial.    Also, the

12 record shows that the agent undertook the inquiry in an effort "to build rapport and generate

13 goodwill[]" at a time when Van Ess was "initially" hostile and suspicious and unwilling to

14 provide information.  (*Id.*)   Petitioner fails to sufficiently support the contention that Van Ess,

15 who maintained that petitioner defrauded him of a substantial sum of money, was ultimately

16 influenced to testify by receipt of the benefit.   Nor does he otherwise establish that this incident

17 so infected the trial with unfairness that petitioner can be said to have been denied due process.

18 This prosecutorial misconduct claim should, therefore, be denied.[1]

19       2.   <u>Grand jury misconduct</u>:

20       Pointing to the attempted bank fraud count dropped prior to trial, petitioner argues that

---

21       1 Petitioner asserts in his reply that his counsel failed to inform him about this incident. However, any
attempt to argue that this omission constitutes ineffective assistance of counsel fails given that it cannot reasonably
22 be said that his counsel's failure to reveal this information either fell below an objective standard of reasonableness
or resulted in actual prejudice.

REPORT AND RECOMMENDATION
PAGE -14

01   the prosecution fabricated a forgery charge in order to secure an indictment from the grand jury

02   on the remaining charges.   He maintains that the decision to bring this charge was a

03   "premeditated act of malice[.]"   (Dkt. 1 at 7.)   However, without any evidence of misconduct

04   in relation to the grand jury, petitioner's allegation is no more than conclusory.   *See James v.*

05   *Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a

06   statement of specific facts do not warrant habeas relief.")   Moreover, the guilty verdicts

07   obtained at trial on the remaining twenty one counts "render harmless any possible error in the

08   grand jury proceeding."   *United States v. Morgan*, 384 F.3d 439, 443 (9th Cir. 2004).

09   Accordingly, this allegation of prosecutorial misconduct should be denied.

10          3.   Perjured testimony:

11          Petitioner claims that the government's expert witness, William Kerr, a national bank

12   examiner with the Office of the Comptroller of the Currency, committed perjury during his

13   cross-examination.   Specifically, petitioner points to Kerr's testimony that he was "vaguely

14   familiar" with an August 1993 Federal Reserve Bulletin entitled "Anatomy of the Medium

15   Term Note Market", *Sherman*, CR 05-181C (Dkt. 143 at 106-07), as inconsistent with

16   testimony Kerr gave in a previous, unrelated trial indicating a "distinct familiarity" with the

17   contents of that bulletin (Dkt. 1 at 7).   Petitioner maintains that Kerr's "appearance as an

18   'expert' witness was nothing more than a cynical and orchestrated effort by the prosecution to

19   foist a fraudulent and contrived frame of reference upon an unsophisticated and unsuspecting

20   jury."   (Dkt. 1 at 8.)

21          "[A] criminal defendant is denied due process of law when a prosecutor either

22   knowingly presents false evidence or fails to correct the record to reflect the true facts when

REPORT AND RECOMMENDATION
PAGE -15

01  unsolicited false evidence is introduced at trial."   *Hayes v. Brown*, 399 F.3d 972, 984 (9th Cir.

02  2005).   *Accord United States v. Agurs*, 427 U.S. 97, 103 (1976) and *Napue v. Illinois*, 360 U.S.

03  264, 269 (1959).   To prevail on such a claim, a petitioner "must show that (1) the testimony (or

04  evidence) was actually false, (2) the prosecution knew or should have known that the testimony

05  was actually false, and (3) that the false testimony was material."   *United States v. Zuno-Arce*,

06  339 F.3d 886, 889 (9th Cir. 2003) (*citing Napue*, 360 U.S. at 269-71).   Petitioner must

07  establish a factual basis for attributing knowledge to the prosecutor as to the perjured testimony

08  or fraudulent evidence.   *See Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004).

09  Also, in assessing materiality, the question is whether there is "'any reasonable likelihood'" the

10  false testimony or evidence could have "'affected the judgment of the jury[.]'"   *Hall v.*

11  *Director of Corrections*, 343 F.3d 976, 983 (9th Cir. 2003) (quoted sources omitted).   "'The

12  question is not whether the defendant would more likely than not have received a different

13  verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial

14  resulting in a verdict worthy of confidence.'"   *Id.* at 983-84 (quoted source omitted).

15          Here, upon being asked about a 1993 Federal Reserve Bulletin on the subject of medium

16  term notes, Kerr requested more detail and noted that several such bulletins had been issued.

17  *Sherman*, CR 05-181C (Dkt. 143 at 106-07).   After petitioner's counsel specified the title and

18  author of the bulletin, Kerr stated he was "vaguely familiar" with the document.   *Id.*

19  Petitioner's counsel did not provide to Kerr for his consideration the bulletin at issue, which, in

20  addition to being one of several bulletins issued on the subject, predated Kerr's testimony by

21  some thirteen years.

22          Petitioner does not submit the prior trial testimony he maintains demonstrates Kerr's

REPORT AND RECOMMENDATION
PAGE -16

01   perjury.   He, instead, relies on his description of Kerr's prior testimony as demonstrating

02   Kerr's "distinct" familiarity with the 1993 bulletin.   This bare assertion does not suffice to

03   establish perjury.   Nor does petitioner proffer any support for a contention that the prosecution

04   could be said to have known the testimony was false or that Kerr's reflection of only "vague"

05   familiarity with the bulletin could be deemed material in this case.   For all of these reasons, this

06   allegation of prosecutorial misconduct should also be denied.[2]

07       4.   Closing argument:

08       Petitioner avers that the government "deliberately misled the jury by obfuscating salient

09   facts[]" during the rebuttal closing argument.   (Dkt. 1 at 8-9.)   Petitioner, on direct, testified

10   that the 1993 Federal Reserve Bulletin described the existence of riskless principle transactions.

11   *Sherman*, CR05-181C (Dkt. 145 at 114-19).   He asserts that, instead of cross-examining him

12   on this point, the prosecutor "waited until he was directly addressing the jury to make the wild

13   and unfounded claim that I used the 'risk free' passage in the Bulletin to falsely assure others

14   that their funds would be placed in a risk-free setting."   (Dkt. 1 at 9.)

15       The portion of the government's rebuttal argument challenged by petitioner consisted of

16   the following statements:

17       Another example, this Federal Reserve article, which you will have to read.   It

---

18       2 In his reply, petitioner appears to extend this prosecutorial misconduct argument into one alleging
19   ineffective assistance of counsel. That is, petitioner questions his counsel's failure to produce the bulletin to Kerr
     for his consideration, both to debunk the testimony generally and to correct the testimony as to only vague
20   familiarity with the document. (Dkt. 13 at 5-8.) Again, however, it cannot be reasonably said that his counsel's
     representation in relation to Kerr either fell below an objective standard of reasonableness or resulted in actual
     prejudice. Petitioner also takes issue with Kerr's testimony as a whole. (*See id*.) However, the Ninth Circuit
21   rejected petitioner's claim regarding the admissibility of Kerr's expert testimony on direct appeal, *see Sherman*,
     CR05-0181c (Dkt. 152-2), and petitioner fails to establish any circumstances that would compel review of this
     claim pursuant to § 2255. *See generally Polizzi v. United States*, 550 F.2d 1133, 1135-36 (9th Cir. 1976) ("[A]
22   district court may refuse to entertain a repetitive [habeas] petition absent a showing of manifest injustice or a
     change in law.")

REPORT AND RECOMMENDATION
PAGE -17

01    talks about medium term notes.  They exist.  They are bonds like long-term
      bonds, short-term bonds, medium-term bonds.  Him waving this article around
02    is like picking up an encyclopedia that says, gold it is a metal; see, this proves
      this Indonesian deal is real.  Read that article.  The quotes he is taken [sic] are
03    completely out of context.

04    There is something else interesting about that.  Remember, when he is
      describing that article, he says, you see this, it says riskless principal.  As you
05    will see from the article, absurdly taken out of context.  Riskless principal,
      riskless, you see, the government, this proves it.
06
      Well, that is consistent, isn't it, with what the investors say Mr. Sherman tells
07    them, riskless.  What he said here, waving the article around, that is what he
      tells the investors.  It is remarkably consistent, despite his denial now, investor
08    after investor after investor.  That is why they given him [sic] the money.

09  *Sherman*, CR05-181C (Dkt. 147 at 88-89).  The prosecutor, at least in part, reasonably

10  attempted to draw a parallel between petitioner's interpretation of the language in the bulletin

11  and the witness testimony that petitioner told them there was no risk in their investments.

12  However, as argued by respondent, even assuming the argument could in some respect be said

13  to have misstated the evidence, petitioner fails to establish his entitlement to habeas relief.

14        In order to assess a claim that a prosecutor's comments constitute a violation of due

15  process, the Court must examine the entire proceedings and place the prosecutor's statements in

16  context.  *See Greer v. Miller*, 483 U.S. 756, 765-66 (1987).  "It 'is not enough that the

17  prosecutors' remarks were undesirable or even universally condemned.'" *Darden*, 477 U.S. at

18  181 (quoted source omitted).  The question is whether it can be said that the "prosecutors'

19  comments 'so infected the trial with unfairness as to make the resulting conviction a denial of

20  due process.'"  *Id.* (*quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).

21        The Court, in this case, properly instructed the jury that "arguments and statements by

22  lawyers are not evidence[,]" and that, "[i]f the facts as you remember them differ from the way

REPORT AND RECOMMENDATION
PAGE -18

01  the lawyers state them, your memory of them controls."  *Sherman*, CR05-181C (Dkt. 147 at

02  35).  *See Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 898 (9th Cir. 1996) ("The arguments of

03  counsel are generally accorded less weight by the jury than the court's instructions and must be

04  judged in the context of the entire argument and the instructions.")  (*citing Boyde v. California*,

05  494 U.S. 370, 384 (1989)). *See also Darden*, 477 U.S. at 182 (prosecutor's improper comments

06  did not deprive the petitioner of a fair trial where "[t]he trial court instructed the jurors several

07  times that their decision was to be made on the basis of the evidence alone, and that the

08  arguments of counsel were not evidence[,]" and "[t]he weight of the evidence against petitioner

09  was heavy; . . . reduc[ing] the likelihood that the jury's decision was influenced by argument.")

10  Moreover, considering the trial and evidence presented as a whole, the prosecutor's argument

11  regarding the bulletin in a brief portion of his closing remarks cannot be said to have so infected

12  the trial with unfairness as to result in a denial of due process.  *See, e.g., Hall v. Whitley*, 935

13  F.2d 164, 165-66 (9th Cir. 1991) (dismissing prosecutorial misconduct claim where

14  prosecutor's remarks were "isolated moments in a three day trial.")  This allegation of

15  prosecutorial misconduct should, therefore, be denied.

16      5.      Selective prosecution:

17      Petitioner argues that the government engaged in selective prosecution by not pursuing

18  the prosecution of Robert Duncan and Milford Walker.  He states that these witnesses

19  "admitted on the stand they were liars, with one also having to admit he was a thief."   (Dkt. 1 at

20  9.)

21      "'[I]n the absence of clear evidence to the contrary, courts presume that [prosecutors]

22  have properly discharged their official duties.'"  *United States v. Armstrong*, 517 U.S. 456,

01  464 (1996) (*quoting United States v. Chemical Foundation, Inc.,* 272 U.S. 1, 14-15 (1926)).

02  Also, while the decision to prosecute may not be based upon an unjustifiable standard such as

03  race, religion, or other arbitrary classification, *id.*, in order to establish a prima facie case of

04  selective prosecution, a petitioner must show both that (1) others similarly situated were not

05  prosecuted, and (2) the prosecution was based on an impermissible motive, i.e. a discriminatory

06  purpose or intent, *United States v. Alexander*, 287 F.3d 811, 817-18 (9th Cir. 2002) (*citing*

07  *United States v. Nelson*, 137 F.3d 1094, 1105 (9th Cir. 1998)).

08       Here, as argued by respondent, petitioner fails to allege a prima facie case of selective

09  prosecution, let alone make a showing that his prosecution proceeded pursuant to any

10  impermissible motive.   This final claim of prosecutorial misconduct should be denied.

11  C.    Judicial Misconduct

12       Petitioner also raises a claim of judicial misconduct.   He maintains that he planned on

13  "covering the main points" of his defense on direct and, after cross examination, to "go into

14  more vivid detail on each point."   (Dkt. 1 at 13.)   Petitioner asserts that, to his surprise, his

15  counsel suddenly indicated during redirect that he had no more questions.   He states that his

16  comment in response – "But I'm not finished!" – was "conveniently omitted from the trial

17  transcript."   (Id.)   Petitioner avers that his counsel subsequently told him he ceased

18  questioning upon receiving a "high sign" from the Court.   (Id. at 13-14.)

19       "Before a jury's verdict will be overturned because of the conduct of a trial judge in . . .

20  intervening in the proceedings, 'it must appear that the conduct measured by the facts of the

21  case presented together with the result of the trial, was clearly prejudicial to the rights of the

22  party.'"   *United States v. Bennett*, 702 F.2d 833, 836 (9th Cir. 1983) (*quoting United States v.*

REPORT AND RECOMMENDATION
PAGE -20

01 *Eldred*, 588 F.2d 746, 750 (9th Cir. 1978)).   Further, the Court's assessment must be made in

02 light of the evidence of guilt.   *Id.* (*citing United States v. Poland*, 659 F.2d 884, 886, 894 (9th

03 Cir. 1981)).

04          In this case, petitioner's counsel began his redirect examination by stating that he had

05 "only a couple of questions" for petitioner.   *Sherman*, CR05-181C (Dkt. 147 at 25).   After

06 raising the first of these questions, counsel addressed his "next topic and last topic[]" of

07 questioning.   *Id.* (Dkt. 147 at 29).   Also, as petitioner concedes, the record does not reflect that

08 he made any comment upon the conclusion of his counsel's redirect.   Accordingly, the record

09 in this case belies petitioner's description of his examination on redirect.

10          Moreover, even assuming the judicial interference alleged, petitioner fails to show he

11 suffered prejudice.   That is, as argued by respondent, considering petitioner's extensive trial

12 testimony and the contradictory testimony offered by numerous witnesses, there is no basis for

13 concluding that additional testimony from petitioner on redirect would have changed the

14 outcome of the trial.   Accordingly, petitioner's allegation of judicial misconduct should be

15 denied.

16 D.     Honest Services

17          Petitioner maintains that he provided "honest services" and points to the United States

18 Supreme Court's decision in *Skilling v. United States*, ___ U.S. ___, 130 S.Ct. 2896 (2010), a

19 case addressing honest-services wire fraud.   However, petitioner was charged with mail and

20 wire fraud for the purpose of obtaining money and property pursuant to 18 U.S.C. §§ 1341 and

21 1343 (Dkt. 6, Add. A), not "honest-services" fraud pursuant to § 1346.   *See Skilling*, 130 S.Ct.

22 at 2908, n.1 ("The mail- and wire-fraud statutes criminalize the use of the mails or wires in

REPORT AND RECOMMENDATION
PAGE -21

01 furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means

02 of false or fraudulent pretenses, representations, or promises.' 18 U.S.C. § 1341 (mail fraud); §

03 1343 (wire fraud). The honest-services statute, § 1346, defines 'the term "scheme or artifice to

04 defraud"' in these provisions to include 'a scheme or artifice to deprive another of the

05 intangible right of honest services.'")   Therefore, Skilling is inapposite and petitioner provides

06 no basis for an award of habeas relief in relation to his alleged honest services.

07                                    CERTIFICATE OF APPEALABILITY

08         A petitioner seeking post-conviction relief under § 2255 may appeal a district court's

09 dismissal of his federal habeas petition only after obtaining a certificate of appealability (COA)

10 from a district or circuit judge.   A COA may issue only where a petitioner has made "a

11 substantial showing of the denial of a constitutional right."   *See* 28 U.S.C. § 2253(c)(2).   A

12 petitioner satisfies this standard "by demonstrating that jurists of reason could disagree with the

13 district court's resolution of his constitutional claims or that jurists could conclude the issues

14 presented are adequate to deserve encouragement to proceed further."   *Miller-El v. Cockrell*,

15 537 U.S. 322, 327 (2003).   Under this standard, the Court concludes that petitioner is not

16 entitled to a COA with respect to any of the claims asserted in his petition.

17                                            CONCLUSION

18         For the reasons set forth above, the Court recommends that petitioner's § 2255 motion

19 be DENIED.   No evidentiary hearing is required as the record and documentary evidence

20 before the Court conclusively shows that petitioner is not entitled to relief.   § 2255(b).   A

21 ///

22 ///

REPORT AND RECOMMENDATION
PAGE -22

01   proposed Order of Dismissal accompanies this Report and Recommendation.

02         DATED this <u>21st</u> day of January, 2011.

03

04

05                   Mary Alice Theiler
                       United States Magistrate Judge

06

07

08

09

10

11

12

13

14

15

16

17

18

19

20

21

22

REPORT AND RECOMMENDATION
PAGE -23